902 P.2d 65

STATE of New Mexico,
Plaintiff–Appellee,

v.

Alfred BACA, Defendant–Appellant.

No. 21347.

Supreme Court of New Mexico.

July 7, 1995.

Sammy J. Quintana, Chief Public Defender, Bruce Rogoff, Assistant Appellate Defender, Santa Fe, for appellant.

Tom Udall, Attorney General, Patricia A. Gandert, Assistant Attorney General, Santa Fe, for appellee.

## OPINION

RANSOM, Justice.

Alfred Baca was convicted on one count of first-degree murder under NMSA 1978, Section 30–2–1(A) (Repl.Pamp.1994), one count of attempted first-degree murder under NMSA 1978, Section 30–28–1 (Repl. Pamp.1994), two counts of kidnapping under NMSA 1978, Section 30–4–1 (Repl. Pamp.1994), and one count of tampering with evidence under NMSA 1978, Section 30–22–5 (Repl.Pamp.1994). He appeals to this Court pursuant to SCRA 1986, 12–102(A)(2) (Repl. Pamp.1992), arguing that several trial errors denied him a fair trial. Finding that when viewed cumulatively the errors did deny Baca a fair trial, we reverse the convictions and remand for a new trial.

*Facts.* On May 26, 1991, ranch workers discovered the body of Baca's wife Geraldine in the middle of a ranch road near Tucumcari. The workers found Baca's three-year-old daughter Renee with her mother's body. Both Geraldine and Renee apparently had been run over by a car. Police investigators received information from Geraldine's parents that implicated Baca. At the hospital Renee told hospital workers that "Huero hit me and my nina." "Huero" is a nickname of Sergio Flores, who played in a band with Baca. Based on this information police investigators began searching for Baca and Flores.

The police found Flores in Texas. The undercarriage of Flores's car (also found in Texas) had blood, hair, and skin tissue on it. The police discovered a gun hidden under a cassette tape box in the back of the car. There was blood on the seatcovers and on an army blanket found in the back seat. Flores was arrested and charged with first-degree murder. Either prior to or concurrent with the arrest and search of Flores, the police also searched Baca's home in New Mexico and found blood on a rug and on a pair of broken eyeglasses. An autopsy revealed that Geraldine had been shot twice in the chest. The blood in the car, on the rug at the house, and on the eyeglasses matched Geraldine's blood type. Further, the hair on the undercarriage of the car matched that of Geraldine and Renee.

At trial there was differing testimony as to what Renee said and did while receiving medical care at the hospital. Several people visited Renee at the hospital, and she stated several times that "Huero" had hurt her. She also allegedly stated to Geraldine's brother that "Huero and daddy killed me and mama." A nurse standing about five feet from Renee at the time of the statement testified that she did not hear Renee say that Baca had hurt her. Several people testified that Renee was frightened when Baca visited her in the hospital. One nurse, however, testified that Renee cried when Baca left the hospital room, and another nurse testified that Renee laid her head on Baca's shoulder when Baca picked her up.

Flores remained in jail for over one year as the prime suspect in the murders. In the summer of 1992 he entered into a plea agreement with the prosecution. In exchange for his testimony against Baca, the State reduced Flores's charges to compounding a crime, harboring a felon, and tampering with evidence. Flores pleaded guilty to these crimes and received a five-year sentence, of which he had already served two years. Had he been convicted of the first-degree murder and the associated crimes, he possibly would have received a life sentence plus fifty-eight years. Also, as part of his plea agreement, Flores took a polygraph examination administered by the State, which he failed.

Using Flores's testimony, the State developed the theory that on May 25, 1991, Baca convinced Flores to go with him to Baca's home, where Baca proceeded to shoot his wife, to drive her and his daughter to a remote road, and to run over his wife and daughter with Flores's car. Specifically, the State introduced evidence that Baca and Flores were playing in a band together at a dance. At approximately 11:00 p.m. the band took an unusually long break, about forty-five minutes. According to Flores's testimony, Baca left the dance during the long break, drove home in Flores's car, and shot Geraldine. Renee saw Baca carry Geraldine from the house and load her into the car. Baca then took Renee, placed her in the back seat of the car, drove to the ranch road, and ran over Geraldine and Renee. Baca returned to the dance between 11:45 p.m. and midnight and finished playing with the band. Flores was the primary witness for the State.

Several other people testified that Baca left the dance during this break, but nobody other than Flores testified that Flores left. Baca produced evidence that Geraldine's mother, Mary Sandoval, spoke to her daughter at or near midnight on the night of the murder. After the dance, Baca and Flores went to a party at a friend's house. Flores left the party at 3:30 a.m., and he testified he drove to Texas about one-half hour later. Baca left the party at 5:00 a.m. Baca also produced evidence that he wore the same clothes after the alleged time of the murder

and for most of the following day and that the clothes did not have blood on them. Flores admitted that his girlfriend washed his clothes when he went to Texas. Further, Baca produced evidence proving that at the time of Flores's arrest, Flores stated that he had not lent his car to anyone on the night of the murder.

Baca testified that, after the party, he went to his brother's house and slept for a few hours. He then returned home. Baca found his son sleeping on a couch but could not find Geraldine. Baca thought that his wife had left him because they had been having marital problems, caused in part by Baca's marital infidelity and in part by Baca's staying out too late. Baca did not notice anything unusual about the house. Baca cleaned up his son and the two of them went looking for Geraldine. They could not find her and decided to attend some Memorial Day activities with Baca's family. Baca was arrested that day for the murder of Geraldine but was released about ten minutes after his arrest because the police had found Flores in Texas. At the time of his arrest Baca stated that Flores probably killed Geraldine because Flores liked her and she did not like him. Baca was not arrested again until almost one year later.

Renee went to several therapists. After some fourteen months she visited with social worker David Breault who testified at trial that Renee expressed a fear of dogs because a dog bit her at the house where "they killed me." When a door slammed during the session with Breault, Renee appeared startled and asked, "My daddy doesn't know where we are, right?" Breault asked Renee if she was afraid of her father, and she shook her head yes. A few months later Renee met with another therapist, Judith Fuhrer. During an interview, Renee repeatedly stated that "they" hurt her or "they" killed her. Each time she was asked to clarify who she meant by "they", and each time she answered "Huero."

*Proceedings.* Baca was brought to trial for the murder. The court declared a mistrial, however, because of juror misconduct. Two months later Baca was tried again. Before this second trial the court ruled that all of its rulings in the first trial would govern the second trial.

Prior to the first trial the State had moved to exclude evidence of Flores's failed polygraph examination, arguing that they did not have notice of Baca's intent to use it. The trial court determined that technically Baca had not followed the steps for introducing a polygraph examination and thus excluded those results. The court also excluded all hearsay statements made by Renee (who did not testify) except those made in the hospital and those made to Breault. Baca objected to evidence of the statements made to Breault and attempted to introduce a video tape of the Fuhrer interview to rebut that testimony. The trial court excluded the video tape as inadmissible hearsay. Finally, the court excluded evidence of certain statements by Mary Sandoval as cumulative, as well as statements made by Flores while he was in jail under indictment for other murder charges in which he implied he had murdered Geraldine.

■ *Lack of written notice of intent to use the results of Flores's polygraph examination should not have precluded admission into evidence.* As part of plea negotiations between the State and Flores, the State arranged and administered a lie-detector test, which Flores failed. Baca attempted to introduce the test results into evidence in his own trial. The State objected on the grounds that Baca had not followed the procedural rules required for admission of a polygraph examination as set out in SCRA 1986, 11–707 (Repl.Pamp.1994). The trial court agreed and refused to admit the results of the polygraph test.

SCRA 11–707(D) states that "[a]ny party who intends to use polygraph evidence at trial[] shall not less than thirty (30) days before trial ... serve upon the opposing party a written notice of such party's intention to use such evidence." In addition to the written notice of intent, the party must serve a copy of the polygraph examiner's report; a copy of each chart made; a copy of any recording made of the pretest interview, actual testing, and posttest interview; and a list of any prior polygraph examinations taken by the examinee in the case. SCRA 11–

707(D)(1)–(4). Baca admits that technically he did not satisfy the notice of intent requirements of SCRA 11–707, but he argues that the State already had the documentation required with the notice because the State had performed the test. Baca also argues the State had notice of his intent to use the results because he placed the person who conducted the test on his witness list as soon as he had received the test results from the State, and because after the first trial the State knew that Baca would attempt again to proffer the polygraph results.

Adherence to the procedural rules for proffering evidence provides the best opportunity for a fair trial, and, unless justice and fairness are shown to dictate otherwise, we will uphold the exclusion of polygraph results when a party does not follow these rules. In this case we are concerned by Baca's failure to follow the rules, particularly because he had an opportunity to satisfy the procedural requirements between the first and second trials. Although the trial court ruled that all of its decisions from the first trial, including the decision to exclude the polygraph results, would govern the second trial, the trial court could have reviewed its previous rulings if there had been a change in circumstances. Thus Baca should have attempted to satisfy the requirements of SCRA 11–707 prior to the second trial.

The purpose of SCRA 11–707, however, is to prevent surprise and to give the opposing party an opportunity to collect rebuttal evidence. In this case the State cannot argue that it was surprised by Baca's attempt to introduce the test results. The State administered the exam, knew of the results, and knew that Baca would call the polygraph test administrator as a witness. Further, the State knew that Flores had failed the exam, and it had ample opportunity to conduct another exam if it so desired. Finally, the State had all of the information that must be delivered with the written notice under SCRA 11–707. Therefore, the purposes of SCRA 11–707 would not be subverted by admission of the polygraph results in this case. Cf. McCarty v. State, 107 N.M. 651, 654, 763 P.2d 360, 363 (1988) (holding that purpose and intent of notice of alibi rule not frustrated by technical failure to follow rule when prosecution knew alibi witnesses would testify and knew content of testimony).

Moreover, the probative value of this evidence is great. Flores was the prime suspect in this case for more than a year, and the State did not fully turn its attention to Baca until Flores agreed to testify against Baca in exchange for a greatly reduced prison sentence. Flores's testimony against Baca made up a good portion of the State's case, and without that evidence a conviction would have been less likely. This is particularly true because Flores was the only witness who directly placed Baca at the crime scene.

On appeal the State argues that the polygraph results were properly excluded because Baca did not lay a proper foundation for their admission. Baca, however, never had the opportunity to lay a foundation for their admission because the trial court, adhering to its ruling at the first trial, excluded the evidence on the basis of a lack of notice of intent to use the evidence. At the new trial on remand Baca must provide a proper foundation, and if he fails to do so, the State may renew its lack of foundation argument at that time.

*Renee's statements to Breault.* Renee essentially made two statements to Breault—the verbal statement that "they killed me" and the nonverbal statement (nodding of the head) that she was afraid of her father. These statements are hearsay if they are "offered in evidence to prove the truth of the matter asserted." SCRA 11–801(C) (hearsay defined). Having determined the statements related to Renee's then existing mental condition, however, the trial court admitted those statements under SCRA 11–803(C) (evidence regarding existing mental condition not excluded by hearsay rule). Baca objected to the admission of the testimony on several grounds, including that it was hearsay used to prove a past act, that it was irrelevant, and that its prejudicial effect outweighed its probative value. The prosecution argues on appeal that the statements were admitted correctly as proof of Renee's then existing mental condition, to show Re-

nee's continuing fear of her father dating back to her hospitalization.

■ —*The first statement is not one of a state of mind.* Even if Renee's state of mind is in issue, a question addressed below, the statement "they killed me" should have been excluded. Renee made the statement in relation to her fear of dogs because a dog allegedly bit her "at the house where they killed me." The phrase "they killed me" modifies the "house" at which a dog bit her and, while one may argue this makes it indirectly relevant to her mental condition, such evidence is not admissible solely because it is relevant to other evidence admissible under a hearsay exception.[1] Although SCRA 11–803(C) allows hearsay statements that show the declarant's then existing mental condition, the rule does not permit evidence explaining why the declarant held a particular state of mind. *United States v. Liu,* 960 F.2d 449, 452 (5th Cir.), *cert. denied,* 506 U.S. 957, 113 S.Ct. 418, 121 L.Ed.2d 341 (1992).

■ —*The second statement is irrelevant and unfairly prejudicial.* For an extrajudicial statement of a declarant's state of mind to be admissible, the state of mind must be relevant. It must "[tend] to make the existence of any fact of consequence to the determination of the action more probable than it would be without the evidence." SCRA 11–401. Furthermore, we believe that in a criminal prosecution such as this, admissibility under SCRA 11–803(C) should depend upon whether the state of mind itself is of consequence to the determination of the *declarant's* conduct. When the state of mind does not prove or negate action or inaction by the declarant, then admissibility of hearsay state-of-mind evidence must be considered under some other rule.

■ The state of mind of the victim of a crime commonly is a fact of consequence in issues of (1) self defense (rebutted by extrajudicial declarations of the victim's passive state of mind), (2) suicide (rebutted by state-ments inconsistent with a suicidal bent), and (3) accident (rebutted by victim's fear of placing self in way of such harm). *See United States v. Brown,* 490 F.2d 758, 767 (D.C.Cir. 1973). In such cases the state of mind of the victim is a relevant part of the conduct in question. The state of mind precedes and informs the conduct. Such state-of-mind evidence is distinguishable from a state of mind that arises out of the conduct and is relevant not because it itself is of consequence but only because an inference can be drawn therefrom to make the existence of some other fact more or less probable. For example, the trial court indeed could have seen this tender-aged child's unnatural declaration of fear of her father as admissible under SCRA 11–804(B)(6) (current version at SCRA 11–804(B)(5) (January 1, 1995)) because it is evidence supporting an inference as to the reason for that fear. SCRA 11–804(B)(6) is the "rule of necessity" and provides that a statement having circumstantial guarantees of trustworthiness equivalent to other recognized hearsay exceptions are not excluded by the hearsay rule if the declarant is unavailable as a witness, there is no other equally probative evidence on the point, and "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Here, however, the trial court apparently relied in error on the state-of-mind exception and did not exercise discretion to admit the declaration under the rule of necessity.

If Renee's fear of her father were to be offered solely to prove an extraneous factual element, that her father attempted to kill her and that he did in fact kill her mother, then we would be faced with the principle that, "[i]n general, where state of mind testimony is sought to be used in an attempt to demonstrate the truth of the underlying facts rather than solely to show state of mind, the evidence must be excluded." *Brown,* 490 F.2d at 763 n. 10.

> The principle danger is that the jury will consider the victim's statement of fear somehow reflecting on *defendant's* state of

---

1. Further, Renee's fear of dogs does not relate to whether Renee had a continuing fear of her father from the time she left the hospital to the time she spoke with Breault. Thus Renee's fear of dogs is not "of consequence to the determination of the action" and is not admissible. *See* SCRA 11–401 (relevant evidence defined).

mind rather than the victim's—i.e., as a true indication of defendant's intentions, actions, or culpability. Such inferences are highly improper and where there is a strong likelihood that they will be drawn by the jury the danger of injurious prejudice is particularly evident.

*Id.* at 766 (footnote omitted). We agree with the *Brown* court in this respect, and we hold that Renee's statement of fear of her father was inadmissible under SCRA 11–803(C) either because it was an attempt to demonstrate a fact of consequence other than the declarant's state of mind or, as emphasized in *Brown,* 490 F.2d at 775–77, because it was unfairly prejudicial.

■ *Under the rule of completeness, the trial court should have admitted the video tape proffered to impeach Renee's statement that "they killed me."* To impeach Renee's statement that "they killed me," Baca attempted to introduce a video tape of Renee taken when she was in therapy with Fuhrer. Several times during the therapy session Renee made the statement that "they killed me." When asked by the therapist who she meant by "they", however, Renee said only "Huero" each time. Baca asserts that this shows Renee meant "Huero" or Flores each time she said "they". He argues that the trial court should have admitted the video tape under the doctrine of curative admissibility or under the doctrine of completeness.[2] Although this issue may be moot in light of our holding that Renee's statement "they killed me" is inadmissible, we address Baca's claim because it illustrates one of the many errors that occurred and deprived Baca of a fair trial.

■ Under the doctrine of completeness, a party may move for the admission of any writing or recorded statement that should, in fairness, be considered contemporaneously with a writing or recorded statement introduced by another party. SCRA 11–106 (completeness rule). The purpose of this rule is to permit parties to introduce recorded statements to place in context other evidence that, when viewed alone, may be mis-

leading. *See State v. Sanders,* 117 N.M. 452, 458, 872 P.2d 870, 876 (1994). Baca argues that Renee's statement, when viewed alone, was misleading because when Renee said "they" she meant "Huero". We agree and believe that under SCRA 11–106 the video tape should have been admitted to place in context Renee's reference to "they". Again, however, this question may be moot.

■ *The trial court should not have limited the evidence impeaching Mary Sandoval.* The State put on evidence that the murder took place sometime between 11:00 p.m. and midnight, a time during which Baca was on break from his band performance. Included within this evidence was testimony from the victim's mother, Mary Sandoval, who testified that she last spoke with her daughter at 11:00 p.m. Baca attempted to impeach Sandoval with her testimony from Baca's preliminary hearing, at which she stated she had last spoken to her daughter at midnight. Baca also attempted to introduce a statement made by Sandoval to Baca's investigator, Willie Garcia, in which she said she had last talked to her daughter around midnight. At the State's request, the trial court excluded Sandoval's statement to Garcia.

The record does not disclose why the trial court excluded Sandoval's statement to Garcia. On appeal the State argues that Baca had ample opportunity to cross-examine Sandoval about her prior statements and that under SCRA 11–403 (exclusion of cumulative evidence) the statement made to Garcia is properly excluded as cumulative of the evidence regarding Sandoval's testimony at the preliminary hearing. Baca argues that although the evidence may be cumulative, it is very probative because it solidifies Baca's theory that Sandoval altered her testimony at trial.

Because the time of the murder is so important to the question of Baca's guilt or innocence, any evidence that tends to show the actual time Sandoval talked with her daughter is very probative. As part of his defense, Baca presented testimony that he

---

**2.** Because we base our holding on the doctrine of completeness, we do not discuss the doctrine of curative admissibility except to acknowledge that

the doctrine has been adopted in New Mexico. *See State Bank of Commerce v. Western Union Tel. Co.,* 19 N.M. 211, 227, 142 P. 156, 162 (1914).

could not possibly have committed the murder after midnight. Although Baca was able to introduce the prior inconsistent statement that Sandoval had made at the preliminary hearing, the statement made to Garcia may be persuasive proof that she changed her story at trial. This evidence was not substantially cumulative and should not have been excluded on that basis.

■ *The trial court should have admitted evidence that Flores bragged about committing the murder.* Baca attempted to introduce evidence that Flores had been on trial for another murder and that while in jail for Geraldine's murder Flores made statements to other prisoners that he got away with the other murder and would get away with this murder as well. Prior to trial the State objected to this evidence. The trial court excluded the evidence because the indictment for murder in the other case did not result in Flores's conviction, and thus his statement was not admissible under SCRA 11–609 (impeachment by evidence of conviction).

On appeal Baca argues that the trial court incorrectly excluded the evidence because the statement by Flores that he would "get away" with this murder is direct evidence that he committed the murder. As such, Baca argues that Flores's statement should be admitted under SCRA 11–801(D)(1)(a) (prior inconsistent statements not hearsay) as a prior inconsistent statement or under SCRA 11–804(B)(4) (hearsay exception) as a statement against interest. The State argues that the evidence was properly excluded under SCRA 11–609 because the trial of Flores did not result in a conviction.

If proffered under SCRA 11–609, the trial court properly would have excluded the evidence that Flores was previously on trial for murder because that rule requires a conviction before such evidence may be used for impeachment. Flores was not convicted, and the fact that he was previously on trial for murder is inadmissible. The evidence regarding Flores's statement to other prisoners, however, was not proffered for impeachment under SCRA 11–609 as evidence of another crime. Thus, although the fact that Flores had been brought to trial on other

murder charges was properly excluded under SCRA 11–609, our inquiry is not over.

Baca sought to use Flores's statement to impeach Flores's testimony that Baca murdered Geraldine. The statement is hearsay under 11–801(C) because it is being used to prove that Flores murdered Geraldine, and it cannot be admitted unless it falls within one of the exceptions enumerated in SCRA 11–803 (availability of declarant immaterial) or SCRA 11–804 (declarant must be unavailable) or unless it is specifically defined under SCRA 11–801(D) as not hearsay. Baca argues that Flores's statement either falls within the statement against interest exception of 11–804(B)(4) or is a prior inconsistent statement under SCRA 11–801(D)(1)(a) and thus by definition is not hearsay.

■ The statement may not be admitted under SCRA 11–804(B)(4). Although Flores's declaration to the other prisoners would be a statement against interest as defined under the rule, SCRA 11–804 exceptions apply only if the declarant is unavailable. In this case Flores testified at trial. Therefore, the statement against interest exception cannot be used to introduce this hearsay testimony.

The statement, however, should have been admitted under SCRA 11–801(D)(1)(a) as a prior inconsistent statement. At the time of trial this rule stated that "[a] statement is not hearsay if . . . [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . inconsistent with the declarant's testimony." Flores testified at trial, was subject to cross-examination, and his statement to the other prisoners was inconsistent with his testimony that Baca committed the murder. Therefore, the statement meets all of the requirements of 11–801(D)(1)(a) and should have been admitted.

■ We note that SCRA 11–801(D)(1)(a) has been amended and now requires any prior inconsistent statement to have been made "under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." 1995 Advanced Annot. & Rules Serv. 197 (Apr. 1995). This amendment, however, would not

apply to this case on remand. Rules of evidence are procedural. *Ammerman v. Hubbard Broadcasting, Inc.*, 89 N.M. 307, 310, 551 P.2d 1354, 1357 (1976), *cert. denied*, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). As such, they are subject to Article IV, Section 34 of the New Mexico Constitution and cannot be changed to affect a right or remedy in a pending case. *See Marquez v. Wylie*, 78 N.M. 544, 546, 434 P.2d 69, 71 (1967); *cf. State v. Norush*, 97 N.M. 660, 662, 642 P.2d 1119, 1121 (Ct.App.) (stating that uniform jury instruction could not be changed to affect defendant's duress defense because of constitutional ex post facto considerations), *cert. denied*, 98 N.M. 50, 644 P.2d 1039 (1982). Because this case was filed and pending prior to the effective date of the amendment, the amendment does not apply. Therefore, Flores's statement to the other prisoners should be admitted under SCRA 11–801(D)(1).

*The prosecutor exceeded the bounds of proper closing remarks.* Finally, Baca complains that prosecutorial misconduct deprived him of a fair trial. Although we do not believe that any alleged misconduct would alone be enough to warrant reversal of Baca's convictions, we review two of the alleged improprieties to guide the trial court on remand.

■ In his closing argument, in an effort to rebut Baca's argument that the evidence was not sufficient to convict, the prosecutor stated that a magistrate judge had considered the evidence at a preliminary hearing and had determined that there was probable cause to believe Baca committed the crimes. Baca objected, and the trial court instructed the jury to disregard the prosecutor's statement. Baca now contends this statement amounted to prosecutorial misconduct. We agree.

■ A prosecutor may not imply that questions of guilt already have been decided by a judicial officer. *See State v. Vallejos*, 86 N.M. 39, 42, 519 P.2d 135, 138 (Ct.App.1974). To do so "effectively usurp[s] the function of the jury." Bennett L. Gershman, *Prosecutorial Misconduct* § 10.6(e) (1994). In this case, however, the trial court admonished the jury to disregard the prosecutor's statement

and later expressly determined that the jury's decision was not affected by the statement. We caution the prosecutor to avoid making such a statement at the trial on remand.

■ The prosecutor also stated during closing argument that he had a higher ethical duty than defense counsel because prosecutors are bound by law to seek the truth whereas criminal defense attorneys are not. Aside from impugning the integrity of defense counsel, this comment implies that the prosecutor would not have pursued this case unless Baca was guilty. Thus the prosecutor essentially was using his position to express a personal opinion on Baca's guilt or innocence. Such expressions of personal opinion are not permitted. *See Vallejos*, 86 N.M. at 42, 519 P.2d at 138. Baca, however, did not object to the prosecutor's remark. As such, the remark cannot be used as a basis to overturn Baca's conviction. *E.g., State v. Riggsbee*, 85 N.M. 668, 672, 515 P.2d 964, 968 (1973) (stating that even when prosecutor exceeds proper bounds, burden is on defendant to object). Yet, we again caution the prosecutor to avoid making such a statement at the trial on remand.

■ *The multiple mistakes amounted to cumulative error and deprived Baca of a fair trial.* Under the doctrine of cumulative error, this Court must reverse a conviction "when the cumulative impact of the errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984). In this case the trial court made several egregious errors, including improperly admitting hearsay testimony without providing the defense with an opportunity to rebut the evidence and improperly excluding evidence that was to be used to impeach the State's primary witness. The trial court also made several minor errors, among them excluding impeachment evidence that was to be used to discredit testimony by State witnesses. Although each of these errors standing alone may not be enough to warrant reversal, the net effect of these errors is that Baca was deprived of his right to a fair trial in contravention of the Fourteenth

Amendment to the U.S. Constitution and Article II, Section 14 of the New Mexico Constitution. Therefore, Baca's convictions for murder, attempted murder, and tampering with evidence are reversed.

 *On remand the trial court must dismiss the kidnapping charges.* The State prosecuted Baca for kidnapping on the grounds that Baca held Geraldine and Renee for service against their will. The State's theory was that Baca moved Geraldine and Renee for the purpose of removing evidence and that such removal of evidence constituted "holding for service" under NMSA 1978, Section 30–4–1(A) (Repl.Pamp.1994) (kidnapping defined). Baca argues that even if there is evidence to prove that he moved his wife and daughter against their will, such was done for the purpose of facilitating the murder and is not "holding for service."

In *State v. Vernon*, 116 N.M. 737, 741, 867 P.2d 407, 411 (1993), this Court determined that the incidental movement of a victim to a remote location for the purposes of facilitating a murder does not by itself constitute kidnapping. In *Vernon* the State argued that the defendant had held the victim for service by removing him to a remote location because such movement served the defendant's purpose of assuring there would be no witnesses to the murder. This Court rejected the State's theory, holding that when a victim is moved to facilitate a murder, "no 'service' is performed by the victim ... because the victim does not confer any independent assistance or benefit to the perpetrator of the crime." *Id.* *But see* 1995 N.M. Laws ch. 84, § 1 (amending kidnapping statute to include taking person "to inflict death, physical injury or a sexual offense on the victim" within meaning of "kidnapping").

This case is substantially similar to *Vernon* because Baca's alleged removal of his wife and daughter for the purposes of reducing evidence is no different than moving a victim to a remote location so that there are no witnesses to the murder. In both cases the incidental movement of the victim is for the purpose of facilitating the murder and the victim "does not confer any independent assistance or benefit to the perpetrator of the crime." Although whether Baca removed his wife and daughter to the remote road is a question dependent upon the credibility of Flores, there is no evidence to support a finding that Baca held his wife and daughter for service. Therefore, under the holding of *Vernon,* the charges of kidnapping must be dismissed.

*Conclusion.* For the foregoing reasons the judgment of the trial court is reversed, and this case is remanded for a new trial on the murder, attempted murder, and tampering with evidence charges. The charges of kidnapping shall be dismissed.

IT IS SO ORDERED.

BACA, C.J., and FRANCHINI, J., concur.