2001-NMCA-097

34 P.3d 630

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Justo (Torres) RUIZ, Defendant– Appellant.**

No. 21,316.

Court of Appeals of New Mexico.

Sept. 27, 2001.

Certiorari denied, No. 27,191, Nov. 8, 2001.

**244**

Patricia A. Madrid, Attorney General, James O. Bell, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

BOSSON, Chief Judge.

{1} In a single trial, a jury convicted Defendant, Justo Ruiz, of criminal offenses committed separately against three minor girls. One girl testified to criminal sexual penetration and criminal sexual contact, another to indecent exposure, and a third to battery. On appeal, Defendant claims the trial court committed reversible error in four ways: (1) by not severing the counts against him so that the charges pertaining to one child, S.G., would be tried separately; (2) by allowing one girl to testify by videotape, thereby circumventing his constitutional right to confront witnesses; (3) by not allowing Defendant to rebut the prosecutor's innuendo that he had not taken a penile plethysmograph test when, in fact, he had; and (4) by not allowing the jury to visit his home to experience how compact the living conditions were and whether the events could have occurred as alleged. Applying established New Mexico law, we hold it was reversible error not to sever the charges, and therefore, we reverse Defendant's convictions and remand. Because the testimony of the girls, if believed by a jury, would support separate convictions, the State is entitled to retry Defendant on all charges in separate trials. We discuss the remaining issues that are likely to reoccur on retrial.

**BACKGROUND**

{2} Defendant and his wife, Cindy Ruiz, had three children. During the night of July 8, 1998, their oldest daughter, L.R., who was then twelve-years-old, awoke to find her father pushing her underwear aside and staring at her vagina with a flashlight. When she told her mother about the incident, the next day Cindy took the children and moved out. Cindy reported the incident to the New Mexico Children, Youth and Families Department which, in turn, reported the allegation to the police. The officer in charge of the police investigation arranged a safehouse interview with L.R. During that interview L.R. recalled the incident, and also reported that a year before she had seen Defendant doing a similar thing to her friend S.G.L.R. also recounted what she had been told by still another girl, L.J., that Defendant had exposed himself to L.J. approximately a year before.

{3} After being alerted to the possibility that Defendant may have accosted other girls, a police officer called the parents of the other girls to arrange for safe-house interviews. When the police officer spoke to the parents about the safe-house interviews, he admonished them "not to attempt in any way to assist the child in recalling memories," so as to avoid contaminating each child's testimony.

{4} A few days later S.G., also age 12, went to her safe-house interview. Contrary to the police officer's admonition, S.G.'s mother on several occasions had assisted her daughter "in recalling memories," raising the possibility of undue influence on S.G.'s testimony. At the interview, S.G. described a series of encounters with Defendant which began with Defendant pulling down her pants and fondling her, and ultimately engaging in sexual intercourse.

{5} L.J. also participated in a safe-house interview. L.J. disclosed to her interviewers that on two separate occasions she had glanced through a doorway in the Ruiz home and saw Defendant standing on the other side of the threshold, holding his penis in both hands and smiling. L.J. was six or seven years old at the time these acts occurred.

{6} Defendant denied all allegations. He contended that the charges were based on either outright fabrications or misperceptions

of benign behavior on his part. Defendant claimed that he was looking for the family cat on his daughter's bed with a flashlight, not staring at her vagina, and that being awakened from a deep sleep had distorted his daughter's perception of events. With regard to L.J., Defendant testified that she may have seen him putting on his coveralls in the garage, but that he had never exposed himself in the manner alleged. As for S.G., Defendant maintained that her story was a total fabrication and the result of her mother's suggestive influence.

{7} A grand jury indicted Defendant on ten counts arising from the three girls' allegations. After a jury trial on all ten charges, Defendant was convicted of eight of the ten counts against him; three counts of criminal sexual penetration of a minor, two counts of criminal sexual contact of a minor, two counts of indecent exposure, and one count of battery. Defendant was sentenced to 61½ years in prison.

## DISCUSSION

### Defendant's Motion to Sever

#### Preservation

■ {8} Before trial, Defendant twice moved to sever the charges pertaining to S.G. from the rest of the case. Both motions were denied. Although Defendant renews his severance argument before this Court, the State counters that the argument was not preserved for appellate review because Defendant failed to reassert his severance motion during the trial. The State relies on *State v. Jones*, 120 N.M. 185, 190, 899 P.2d 1139, 1144 (Ct.App.1995), for this proposition, but that reliance is misplaced.

■ {9} At times, as the State points out, we have faulted defendants for not renewing severance motions after the trial began. For example, we observed in *Jones* that a severance motion during trial was appropriate because, in that case, it was unclear before trial which defenses the accused would raise. *See id.* Therefore, before trial began, the court could only speculate about whether the prosecution would actually need the challenged evidence to rebut those defenses. *See id.* But neither *Jones*, nor any other opinion of this Court, has ever made renewal of a motion for severance either during or after trial a prerequisite to preserving an issue for appellate review. *See State v. Peters*, 1997–NMCA–084, ¶ 6, 123 N.M. 667, 944 P.2d 896 (addressing a severance issue preserved only by pretrial motion); *State v. McGill*, 89 N.M. 631, 632, 556 P.2d 39, 40 (Ct.App.1976) (same). *Jones* merely acknowledges that when a trial court is not alerted before trial to the defense's theory so that it can rule intelligently on a motion to sever, the court should have another opportunity to consider the motion after the facts become more clear. *Id.*, 120 N.M. at 190, 899 P.2d at 1144.

{10} Here, the State uses *Jones* to argue that Defendant had to renew his severance motion during trial so that the court could rule with "knowledge of the defenses asserted." However, when Defendant renewed his motion on the first morning of trial, all parties, including the court, were aware that the defense was a simple denial of the charges. Defendant took the position that the girls had either fabricated the allegations or misapprehended otherwise innocent behavior on his part. There was no need to provide the trial court with more information during trial; the court had all the information it needed before trial to assess the State's position in light of the defenses asserted. The State's preservation argument is without merit.

### Rule 11–404(B) NMRA 2001

■ {11} We now address the merits of Defendant's severance argument. Separate charges against a defendant are ordinarily joined when the offenses "are of the same or similar character, even if not part of a single scheme or plan." Rule 5–203(A)(1) NMRA 2001. However, even when Rule 5–203(A) is satisfied, charges should be joined only if joinder does not unfairly prejudice either party. *See* Rule 5–203(C). A defendant is unfairly prejudiced when joinder allows the jury to consider evidence that would not otherwise be admissible under Rule 11–404(B) NMRA 2001, if the trials were severed. *State v. Gallegos*, 109 N.M. 55, 64, 781 P.2d 783, 792 (Ct.App.1989) ("[I]t is 'fundamental, however, that courts must not permit a defendant to be embarrassed in his defense by a multiplicity of charges to be tried before

one jury.'" (Quoting *State v. Paschall*, 74 N.M. 750, 752–53, 398 P.2d 439, 440 (1965).)). As this Court recently stated, "[t]he granting of a severance is discretionary, and one test for abuse of discretion is whether prejudicial testimony, inadmissible in a separate trial, is admitted in a joint trial." *Jones*, 120 N.M. at 186, 899 P.2d at 1140.

{12} Defendant claims to have suffered this very prejudice when the charges relating to all three girls were joined in one trial. He argues that joinder permitted the jury to consider evidence that would not have been cross-admissible under Rule 11–404(B), if the charges pertaining to each girl had been tried separately. We begin our analysis with Rule 11–404(B):

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

{13} Rule 11–404(B) is a specialized rule of relevancy that, like its federal counterpart, limits the admissibility of evidence that, although relevant, is unfairly prejudicial to the accused. *State v. Phillips*, 2000–NMCA–028, ¶ 21, 128 N.M. 777, 999 P.2d 421; *see also Old Chief v. United States*, 519 U.S. 172, 181, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (stating that although evidence of other bad acts is " 'relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect' " (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982))). The risk is that "character evidence when used circumstantially is likely to be given more probative value than it deserves and may lead the fact-finder to punish a bad person regardless of the evidence of what happened in the specific case." *State v. Lamure*, 115 N.M. 61, 69, 846 P.2d 1070, 1078 (Ct.App.1992) (Hartz, J., specially concurring). Thus, Rule 11–404(B) prohibits the use of evidence when its purpose is to show criminal propensity: "to prove the character of a person in order to show action in conformity therewith." The admonition of former Judge Hartz of this Court bears repeating: "One cannot ignore the long tradition of courts and commentators expressing fear that jurors are too likely to give undue weight to evidence of a defendant's prior misconduct and perhaps even to convict the defendant solely because of a belief that the defendant is a bad person." *Lamure*, 115 N.M. at 71, 846 P.2d at 1080.

{14} When reviewing a motion to sever through the lens of Rule 11–404(B), "a more detailed analysis needs to be done than simply comparing superficial similarity" of the crimes. *Jones*, 120 N.M. at 187, 899 P.2d at 1141. Because Rule 11–404(B) recognizes the grave risk of unfair prejudice when evidence of multiple bad acts is introduced in a single trial, courts must be careful to analyze the proffered evidence as if the charges were not joined together and the trials were separate. *See id.; see also State v. Lucero*, 114 N.M. 489, 494, 840 P.2d 1255, 1260 (Ct.App. 1992) (observing that prior-bad-acts evidence "is especially damaging" when the case "involves a particularly reprehensible crime against a child"); *State v. Aguayo*, 114 N.M. 124, 130–31, 835 P.2d 840, 846–47 (Ct.App. 1992) (same).

{15} Approaching the evidence in such a fashion, we follow a two-step test to determine if the evidence would have been cross-admissible in separate trials with respect to each girl. We first ask if there is "an articulation or identification of the consequential fact to which the proffered evidence of other acts is directed" that satisfies a valid exception to the general prohibition on propensity evidence. *Jones*, 120 N.M. at 187, 899 P.2d at 1141. If the evidence is probative of something other than propensity, then we balance the prejudicial effect of the evidence against its probative value to determine if "[the] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury." Rule 11–403 NMRA 2001. In this appeal, we need concern ourselves only with the first question.

{16} We ask what is this "consequential fact" to which the evidence of other bad acts is directed, and is it valid under Rule 11–404(B)? At trial, the State asserted, rather indiscriminately, that the evidence supporting each of the ten counts would have been cross-admissible in separate trials to prove "defendant's motive, intent, knowledge, absence of mistake or accident under Rule 11–404(B)." On appeal, the State discards its scatter shot approach and concentrates on only one of the Rule 11–404(B) exceptions. It now asserts the evidence was admissible to demonstrate "absence of mistake."

{17} In refining its focus on "absence of mistake," the State argues that the evidence pertaining to each girl was necessary to rebut Defendant's position that the events never happened or were due to mistaken perceptions on the part of three young girls. By putting all the bad-acts evidence before the jury, the State hoped to create an aura of credibility; that it was less likely that any of the girls were "mistaken" in what they saw, because each girl testified to deviant conduct on the part of Defendant. However, the State misapprehends what "absence of mistake" permits under Rule 11–404(B).

{18} Analyzing the State's argument in context, we see no difference between what the State argues and the use of that same evidence to show propensity: that Defendant did bad things with one girl and it was therefore more likely that he did bad things with the others. But this is the same as "prov[ing] the character of [Defendant] in order to show action in conformity therewith," which is prohibited by Rule 11–404(B). Grouping the testimony of all of the girls together in the same trial may well have persuaded the jury that each girl's account of what transpired should be believed, and that there was no "absence of mistake" on their part. But it did so only demonstrating propensity: that Defendant had a tendency to abuse children sexually, and if he abused one girl, then he likely abused the others. This is exactly what Rule 11–404(B) does *not* allow. *See Aguayo,* 114 N.M. at 129, 835 P.2d at 845 ("Admission of character traits to prove that the defendant acted in accordance with those traits is, of course, exactly what Rule 11–404(B) is designed to prohibit.").

{19} What the State really wanted was an opportunity to bolster the testimony of these three girls. While we may sympathize with the State's desire to improve its position, and while "we recognize the potential difficulty in prosecuting such cases" involving sex crimes against children, it is equally true that "the appropriate solution is [not] to wink at the dictates of Rule [11–]404(B)." *Lucero,* 114 N.M. at 494, 840 P.2d at 1260. As we have previously stated, "the need to bolster the victim's credibility," and "the belief that sex crimes alone are more likely to follow a pattern based on the unique psychological profile of a likely perpetrator," are not recognized exceptions for admissibility under Rule 11–404(B), and they do not justify "manipulating the categories in the rule to accommodate prior bad acts evidence." *Lucero,* 114 N.M. at 494, 840 P.2d at 1260 (internal quotation marks and citation omitted); *see also Aguayo,* 114 N.M. at 131, 835 P.2d at 847 (rejecting the "siren song" of relaxing Rule 11–404(B) because of difficulty in proving child abuse cases).

{20} Defendant's mistake-of-fact rationale is also controlled by our prior analysis in *Jones,* 120 N.M. at 186, 899 P.2d at 1140, a case in which the accused was convicted of sexually assaulting two women, under similar circumstances, five days apart. Over objection, the charges pertaining to both women were tried jointly, and we reversed for failure to sever. *Id.* at 190, 899 P.2d at 1144. The accused denied each woman's version of events, arguing that his relationship with each woman was voluntary and consensual, and that their recollection of events was wrong. *Id.* at 186, 899 P.2d at 1140. The state argued, in part, that the testimony of each woman was permissible in a single trial to rebut the defendant's claim of consent. *Id.* at 189, 899 P.2d at 1143. This Court disagreed stating, "Defendant's defense here was simply that his version of the consensual nature of the entire evenings should have been believed over the testimony of [each victim];" what this Court called a "stark and substantial credibility issue." *Id.* We held that the state's use of the evidence to chal-

lenge the defendant's credibility was an attack on the defendant's character, observing that "the way the evidence accomplishes this is through the prohibited method of proving propensity." *Id.* Our holding in *Jones* applies with equal force to the case before us.

{21} We read *Jones* to limit the "absence of mistake" exception under Rule 11–404(B) to situations when a defendant claims to have made a mistake, such as when the accused admits to touching the victim but says it was accidental or by mistake. *See Jones,* 120 N.M. at 188–89, 899 P.2d at 1142–43; *cf. State v. Beachum,* 96 N.M. 566, 568, 632 P.2d 1204, 1206 (Ct.App.1981) (holding that the defendant did not put intent at issue when he claimed that he "did not commit the acts at all, not that he committed them without the requisite state of mind," and therefore bad-acts evidence under Rule 11–404(B) was precluded). The exception does not apply, however, to show "absence of mistake" on the part of a *witness* or the *victim,* who the accused claims is mistaken in his or her recollection of events. Traditionally, our courts have allowed evidence of a defendant's other acts to disprove accident or mistake after the defendant suggests that the crime came about through accident or mistake *on his or her part. See State v. Nguyen,* 1997–NMCA–037, ¶ 9, 123 N.M. 290, 939 P.2d 1098 (admitting evidence to prove that the defendant knowingly transferred a forged bingo card to rebut defense that transfer was innocent mistake).

{22} Focusing "absence of mistake" on the defendant is in line with other jurisdictions and commentators. *See, e.g., State v. Fitzgerald,* 39 Wash.App. 652, 694 P.2d 1117, 1123–24 (1985) (admitting evidence of earlier sexual abuse of a girl under Rule 11–404(B) when the defendant testified to accidently touching the girl's vagina in the case before the court); *see also United States v. Huels,* 31 F.3d 476, 479 (7th Cir.1994) (holding that rebuttal testimony of witness who grew marijuana in the same spot with the defendant was admissible under Rule 11–404(B) to rebut the defendant's testimony that he was in the marijuana garden by happenstance, hunting deer); *State v. Cirelli,* 115 Idaho 732, 769

P.2d 609, 611 (Idaho Ct.App.1989) (admitting evidence tending "to show a lack of mistake as to [the defendant's] knowledge of the stolen nature of the property"). *See generally* 1 John W. Strong et al., *McCormick on Evidence* § 190, at 664 (5th ed.1999) (allowing evidence of other bad acts "[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge" (footnotes omitted)); 1 Barbara E. Bergman & Nancy Hollander, *Wharton's Criminal Evidence,* § 4:35, at 418 (15th ed.1997) (stating that evidence is permissible under the rule "to show the absence of accident or mistake in committing the crime charged"); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 112, at 658 (2d ed.1994) (acknowledging that the larger number of cases find evidence of other bad acts appropriate once the defendant asserts that his involvement in a crime was inadvertent or accidental). We are unaware of any authority that has admitted evidence of a defendant's other bad acts to prove that a witness was not mistaken, nor does the State direct us to any such authority. *Cf. Beachum,* 96 N.M. at 568, 632 P.2d at 1206.

{23} We hold that it was error not to sever the charges pertaining to S.G. as Defendant requested. We also note that Defendant suffered grave prejudice when he had to defend against charges pertaining to all three girls. *See Jones,* 120 N.M. at 190, 899 P.2d at 1144 (noting that a defendant's convictions alone suffices to demonstrate prejudice). We need only repeat the comments the trial judge rendered after the verdict as to what effect joinder had on the outcome:

> Yes, this was a close case. But I think it was not just Mr. Ruiz' word against the girl. We can't forget that Mr. Ruiz' own daughter testified to the incidents of abuse, as did another child, so it wasn't just one-on-one. It was three victims, [and] I never could determine why they would conspire together to get Mr. Ruiz. And I think the jury resolved it in that manner.

{24} The State has not persuaded us to depart from our reading of *Jones* and the test for admissibility of evidence of other bad

acts set out therein. If we were to allow evidence of bad acts every time an accused protests that a prosecution witness is mistaken, one small exception would swallow the entire rule. We conclude that the evidence pertaining to each girl would not have been cross-admissible in separate trials, and therefore the trial court abused its discretion in not severing the trials upon request.

### S.G.'s Trial Testimony By Pre-recorded Videotape

{25} S.G. was allowed to testify by videotape instead of appearing in court. Defense counsel participated in the videotaped testimony under protest. Defendant argues the trial court failed to follow the applicable rules when it allowed S.G. to testify in this manner instead of appearing in court.

{26} The statutory law of New Mexico allows a trial court, upon a showing of good cause, to "order the taking of a videotaped deposition of any alleged victim under the age of sixteen years." NMSA 1978, § 30–9–17(A) (1978). The videotape "shall be viewed and heard at the trial and entered into the record in lieu of the direct testimony of the alleged victim." *Id.* Under our rules of criminal procedure, good cause is demonstrated when "the child may be unable to testify without suffering unreasonable and unnecessary mental or emotional harm." Rule 5–504(A) NMRA 2001.

{27} Defendant offers two reasons why the trial court erred in allowing S.G. to testify by videotape. First, the trial court did not afford Defendant the discovery necessary to contest the prosecution's assertion that S.G. would suffer "unreasonable and unnecessary mental or emotional harm" by testifying at trial. Second, the trial court failed to make any findings of fact directed specifically at S.G.'s mental or emotional harm.

{28} We find each of Defendant's arguments persuasive. Defendant was denied two requests for discovery: (1) production of S.G.'s mental health records, and (2) an independent examination of S.G. by a court-appointed psychiatrist. The trial court entered a protective order preventing Defendant from discovering S.G.'s mental health records in the possession of both her therapist and the Santa Fe Family Center, and denied the request for an independent psychological evaluation. We analyze each request separately.

### Medical Records

{29} The State contends that S.G.'s mental health records were subject to the psychotherapist-patient privilege. *See* Rule 11–504 NMRA 2001. Defendant argues that S.G. waived any such privilege when she allowed her therapist to discuss her mental condition with the prosecutor's office to show the State she needed to testify by videotape. Defendant cites to an exception to the privilege, Rule 11–504(D)(3), which states: "There is no privilege under this rule as to communications relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of the patient's claim or defense . . . ."

{30} The State counters that the mental health records were not germane to the charges against Defendant regarding S.G., and therefore, S.G. did not rely upon her mental condition "as an element of [her] claim or defense" within the meaning of Rule 11–504(D)(3). Furthermore, even if S.G. did waive the privileged nature of her records, the State faults Defendant for failing to make a threshold showing that the records were material to his defense.

{31} The trial court conducted a hearing on whether to grant the prosecution's motion for videotaped deposition in lieu of live testimony. The hearing was a "proceeding" within the meaning of the Rule. Further, S.G.'s mental or emotional condition was the sole issue at that proceeding. To rule on the motion, the trial court had to determine whether S.G. "may be unable to testify without suffering unreasonable and unnecessary mental or emotional harm." Rule 5–504(A). Thus, S.G. was relying upon the condition of her mental health "as an element" of her request for a videotaped deposition within the meaning of Rule 11–504(D)(3). In such proceedings, "[t]here is no privilege . . . as to communications relevant to an issue of

[S.G.'s] physical, mental or emotional condition." Rule 11–504(D)(3).

{32} Nevertheless, waiver of the psychotherapist-patient privilege as set forth in Rule 11–504(D)(3) does not automatically make all the records discoverable. Privacy concerns are still fundamental. To protect a child's privacy, we require that there "be a threshold showing by defendant that the records may reasonably be expected to provide information material to the defense." *State v. Gonzales*, 1996–NMCA–026, ¶ 21, 121 N.M. 421, 912 P.2d 297. As part of his threshold showing, Defendant argues he had a good faith belief that S.G. fabricated her allegations, and that her medical records would support this belief.

{33} Defendant's suspicion of fabrication is not without substance. The record supports an inference that S.G. initially denied that anything had happened with Defendant, and she only changed her recollection after repeated questioning and blandishments on the part of her mother. Despite the police officer's request not to assist S.G. in recalling the events, S.G.'s mother did exactly the opposite, including what could be called exerting suggestive influence on her daughter's memory.

{34} The possibility of undue influence on S.G.'s testimony is troubling in this case. Consistent with the police officer's admonition, "the importance of *proper* interview techniques as a predicate for eliciting accurate and consistent recollection" from children cannot be denied. *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372, 1378 (1994) (citing Gail S. Goodman et al., *Optimizing Children's Testimony: Research and Social Policy Issues Concerning Allegations of Child Sexual Abuse in Child Abuse, Child Development, and Social Policy* (Dante Cicchetti & Sheree L. Toth, eds.1992)). Many of the techniques allegedly used in questioning S.G. are subject to criticism. *See* American Prosecutors Research Institute, National Center for Prosecution of Child Abuse, *Investigation and Prosecution of Child Abuse* 59–61, 67–75, 81 (2d ed.1993); *see also Michaels*, 642 A.2d at 1378. Although the problems of parental influence are arguably more pronounced in younger children, "[s]uggesti-

bility is not simply a matter of age." 1 John E.B. Myers, *Evidence in Child Abuse and Neglect Cases* § 1.10, at 36 (3d ed.1997). The impact of suggestibility on an individual's recall "depends on a host of situational, developmental, and personality factors." *Id.* Given the problems associated with improper questioning of children, the circumstances surrounding S.G.'s allegations raise legitimate concerns about the reliability of her allegations. Defendant should have been allowed to pursue those concerns aided by appropriate discovery.

{35} S.G.'s therapist, who testified on behalf of the State, conceded that the depression, fear, and anxiety that S.G. felt about testifying in open court were consistent with those of a child being untruthful about her allegations. One purpose of confrontation is so "the moral suasion of facing the accused might influence the child to tell the truth." *State v. Tafoya*, 108 N.M. 1, 3, 765 P.2d 1183, 1185 (Ct.App.1988). Overall, the record supports Defendant's belief that S.G.'s mental health records may provide information material to his defense of fabrication. Thus, S.G.'s mental health records in the custody of her therapist and the Santa Fe Family Center were an appropriate avenue of discovery.

{36} However, Defendant was not necessarily entitled to all such records. The trial court still had an important role to play in balancing the best interests of the child with the fundamental rights of the defense. At trial, Defendant pressed for the release of all records in the possession of S.G.'s therapist and the Santa Fe Family Center, including as an alternative, a request that the trial judge inspect the records in camera. Appropriately, Defendant scales back his request on appeal. Defendant now asserts that the correct course of action is for the trial judge to perform an in camera review of the records to determine what is discoverable. We agree. *See Gonzales*, 1996–NMCA–026, ¶ 20, 121 N.M. 421, 912 P.2d 297. On retrial, the trial court should conduct an in camera inspection to determine what information supports or undercuts S.G.'s claim of "unreasonable and unnecessary mental or emotional harm" along with what information supports or undercuts Defendant's claim of fabrication

and undue influence. Information that the trial court deems relevant to the State's motion should be turned over to defense counsel subject to appropriate protective orders concerning the disclosure of the information and limits on its use.

### Independent Psychological Evaluation

■ {37} The trial court also denied a request for an independent psychological evaluation, finding that Defendant had "failed to demonstrate any issue regarding the competency of [S.G.] to be a witness." However, S.G.'s competency to be a witness was never at issue. The issues presented to the trial court were whether S.G. would suffer unreasonable and unnecessary mental or emotional harm if she were to testify in open court, and whether the defense of fabrication warranted an independent evaluation. In cases such as this, deciding whether to grant an independent psychological exam does not turn on the general competency of a witness. *Cf. State v. Garcia*, 94 N.M. 583, 586–87, 613 P.2d 725, 728–29 (Ct.App.1980) (authorizing independent psychological exam on question of victim's mental anguish although no claim that the victim was mentally incapacitated).

■ {38} We have held that a trial court abuses its discretion by refusing a defendant's request for a psychological evaluation of the victim when the evaluation is necessary to rebut a claim of mental anguish that the State is required to prove. *Id.* The State attempts to limit *Garcia* by pointing out that the mental anguish of the victim in that case was an essential element of the crime, whereas here, S.G.'s mental anguish is only relevant to "whether she would testify in person at trial or by videotape." We are unpersuaded by the distinction. The State placed S.G.'s mental state at issue, and whether that occurs in a pretrial motion or the trial itself is of little consequence to our analysis. Under *Garcia*, reasonable discovery not precluded by law must be granted. *See id.*

{39} Parenthetically, we acknowledge an ambiguity in the law with respect to the standard a movant must meet to persuade the court to order a psychological examination. Under *Garcia*, the movant need not prove a "compelling reason" for the examina-

tion, "where there was a specific basis for the examination (to discover information concerning the mental anguish which the State was required to prove)." *Id.* That "specific basis" is present here. Yet the committee commentary to Rule 5–504 characterizes psychological evaluations as appropriate only "in the rare case" to show good cause for a videotaped deposition under the rule. The committee commentary properly points to the potential for emotional harm if psychological evaluations of juveniles are abused.

■ {40} We need not resolve the issue here because Defendant argues that he has, in fact, demonstrated a compelling need for the evaluation. *See Garcia*, 94 N.M. at 586, 613 P.2d at 728 (recognizing the compelling reason approach). Defendant also asserts that his compelling need for independent psychological evaluation extends to the preparation of his defense as well as rebutting the prosecution's motion for a videotaped deposition. In New Mexico, a compelling need is demonstrated when "the probative value of the evidence reasonably likely to be obtained from the examination outweighs the prejudicial effect of such evidence and the prosecutrix' right of privacy." *State v. Romero*, 94 N.M. 22, 27, 606 P.2d 1116, 1121 (Ct.App. 1980), *overruled on other grounds by State v. Johnson*, 1997–NMSC–036, ¶ 34, 123 N.M. 640, 944 P.2d 869. Given the manner in which S.G.'s allegations developed, and the therapist's admission that S.G.'s fear of testifying was consistent with a child that was not being truthful, Defendant may have demonstrated a compelling need. However, we leave that determination to the trial court in the sound exercise of its discretion and in light of all the relevant factors. We are confident that the court on remand can use its considerable powers to protect the child while ensuring that Defendant has the information he reasonably needs to oppose the State's motion for videotaped testimony.

### An Order For Videotaped Trial Testimony Must Be Supported By Findings of Fact

■ {41} When a trial court concludes that the potential harm to a child outweighs a defendant's constitutional right

to confront that child at trial, the court must make individualized findings as to why the child needs special protection. *Tafoya*, 108 N.M. at 3, 765 P.2d at 1185 (citing *Coy v. Iowa*, 487 U.S. 1012, 1021, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)). "Absent findings indicating the trial court was persuaded and why, the decision to deny a defendant his or her right of confrontation cannot be adequately reviewed on appeal." *State v. Benny E.*, 110 N.M. 237, 242, 794 P.2d 380, 385 (Ct.App.1990). Although the State concedes that no findings were made here, the State contends that the trial court's ruling was supported by substantial evidence. However, as an appellate court, it is not our function to make the findings necessary to support the trial court's ruling. *See id.* The failure to incorporate findings into the court's ruling was error.

### Admissibility of Defendant's Penile Plethysmograph Test Results

{42} The defense included the testimony of Dr. Ned Siegel, who testified that Defendant's psychological profile was not consistent with that of a pedophile. On cross-examination, the prosecutor questioned whether Dr. Siegel had performed a penile plethysmograph test,[1] which the prosecutor described as a test "customarily used to identify pedophiles." Dr. Siegel responded, "No, I did not. I do not do that."

{43} Before redirect examination began, defense counsel requested a recess to allow Dr. Siegel to examine the report of Dr. Moss Aubrey. Dr. Aubrey had performed a penile plethysmograph test on Defendant, which Defendant passed. Defendant informed the trial court that he had decided not to call Dr. Aubrey to testify about the test because the results failed to meet the standards for reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and therefore the test was not admissible. Defendant argued that the prosecution's questions left the jury with the impression that he had failed to take a legitimate test to determine pedophi-

lia, and therefore, he should be allowed to rebut the prosecution's innuendo by introducing the test results.

{44} The trial court ruled that Dr. Siegel could not testify about the results of Dr. Aubrey's test, but the court would permit Defendant to testify that he had passed the penile plethysmograph test if he took the stand. In reliance on this ruling, Defendant questioned Dr. Siegel on redirect about the significance of the penile plethysmograph test and how to interpret the results of that test. However, before Defendant began his testimony, the State objected to any testimony about passing the test on the ground that the test results were never disclosed to the prosecution. Although the trial court noted that Defendant was not obligated to disclose material that it did not intend to use, the court nonetheless sustained the State's objection. Defendant then requested the trial court to instruct the jury to disregard all the testimony about the penile plethysmograph. The trial court denied the request.

{45} Defendant first argues that the prosecutor committed misconduct in questioning Dr. Siegel about the administration of a penile plethysmograph test. The misconduct is predicated on the assumption that the prosecutor knew, or should have known, that penile plethysmograph results are generally inadmissible. We assume, without deciding, that the results of the penile plethysmograph test are not reliable enough to be considered admissible. *See, e.g., Doe v. Glanzer*, 232 F.3d 1258, 1266 (9th Cir.2000) (holding that "courts are uniform in their assertion that the results of penile plethysmographs are inadmissible as evidence"). Nonetheless there is no evidence in the record that the prosecutor was privy to this knowledge, or should have known it. Defendant, who was aware of the admissibility problem, could have informed the prosecutor (and the trial court) of the fact with a timely objection, but he failed to do so. Although we do not approve of questioning a witness about inadmissible matters, we cannot find prosecutorial misconduct on this record.

---

1. The penile plethysmograph measures penile response to visual or auditory erotic stimuli. *See* 1

Meyers, *supra*, § 5.53, at 580–81.

{46} Defendant also asserts that the trial court erred by not allowing him to rebut the inference left with the jury that he had not taken a valid testing procedure, presumably out of fear that he would fail it. Although Defendant admits that the results of the penile plethysmograph are not admissible, Defendant asserts that he was entitled to present evidence that he had taken and passed the test, once the prosecution opened the door by questioning Dr. Siegel about it. We agree.

{47} Our precedents permit otherwise inadmissible evidence to be used to rebut the same under the doctrine of curative admissibility. *State v. Baca*, 120 N.M. 383, 390 n. 2, 902 P.2d 65, 72 n. 2 (1995) (recognizing that New Mexico adopted curative admissibility); *see also State Bank of Commerce v. W. Union Tel. Co.*, 19 N.M. 211, 227, 142 P. 156, 162 (1914) (permitting rebuttal evidence to counterbalance incompetent evidence entered into record without objection). In this regard, the trial court correctly decided to allow Defendant to testify to the result of his test in order to rebut the prosecutor's remarks. The trial court erred when it changed its mind.

{48} We recently reversed a criminal conviction after a defendant had relied on a trial court's evidentiary ruling, which the court later reversed to Defendant's detriment. *See State v. Glasgow*, 2000–NMCA–076, ¶ 1, 129 N.M. 480, 10 P.3d 159, *cert denied*, 129 N.M. 385, 9 P.3d 68. *Glasgow* acknowledged that "inconsistent application of the rules may have a prejudicial effect upon defense strategy." *Id.* ¶ 14. The lesson of Glasgow applies to the case at bar.

{49} We need not concern ourselves with the level of prejudice Defendant may have suffered because we are reversing the convictions on other grounds. At a minimum, however, the trial court's ruling prevented Defendant from rebutting the prosecutor's comment with evidence of the test results, which is the express purpose of the curative admissibility doctrine. *See* Strong, *supra*, § 57, at 252–53 & n. 2 (permitting rebuttal with inadmissible evidence once the opposing party has opened the door with inadmissible evidence, a doctrine described as "[f]ighting fire with fire").

### Viewing the Scene

{50} Defendant's house was small, only 820 square feet. Part of S.G.'s testimony was that she was often molested inside the house with Cindy or the children in the adjoining rooms, in some cases with children in the same room but asleep in a bed two feet away. Defendant took the position that S.G.'s testimony was incredible given the cramped living conditions. To allow the jury to experience how close the living conditions were, and properly gauge the likelihood of S.G.'s allegations, Defendant moved the trial court to allow the jury to go to view the house. The trial court denied the motion.

{51} We consider four factors when reviewing whether a jury should be allowed to view a scene, reviewing them under an abuse of discretion standard. *State v. Maddox*, 99 N.M. 490, 491–92, 660 P.2d 132, 133–34 (Ct.App.1983). They are

(1) the importance of the evidence to be obtained and the circumstances of the case on trial, (2) whether it is reasonably certain the view will substantially aid the jury in reaching a correct verdict, (3) whether the jury could visualize the scene or the object to be viewed from the testimony submitted, and (4) whether conditions of the scene since the time of the [event] are sufficiently the same at the time of the trial to make a jury view helpful.

*Id.* (citations omitted).

{52} Defendant does not address the factors individually. We note that at trial Defendant did illustrate how small the house was by marking out the dimensions of the house, to scale, *inside* the courtroom. Defendant also introduced an array of photographs designed to depict the close proximity within which the family lived. Coupled with the testimony of the witnesses, such evidence was sufficient for the jury to visualize the circumstances of Defendant's house. The trial court had the discretion to deny Defendant's motion and, under these circumstances, the court did not abuse its discretion.

## CONCLUSION

{53} The trial court erred in denying Defendant's motion to sever the charges against him, and therefore we reverse his convictions. Because the testimony of the girls, if believed, provides sufficient evidence to convict, we remand for new trials consistent with this opinion.

{54} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID, Judge, and CELIA FOY CASTILLO, Judge.