This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date:  August 13, 2018**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                    **NO. S-1-SC-36080**

**JESUS SUAREZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Christina P. Argyres, District Judge**

Law Works, LLC
John A. McCall
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Laurie Pollard Blevins, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**DANIELS, Justice.**

{1}     Defendant Jesus Suarez appeals his convictions of felony murder and related charges on three grounds that he did not raise in the district court: that the court violated his constitutional rights by admitting statements he made to police, that the jury instruction on the elements of aggravated assault was erroneous, and that he received ineffective assistance of counsel because his attorney failed to try to have this prosecution joined for trial with a separate prosecution against Defendant for the murder of a different victim at a different location using the same weapon used in this homicide.

{2}     We affirm Defendant's convictions by nonprecedential decision. *See* Rule 12-405(B) NMRA ("The appellate court may dispose of a case by non-precedential order, decision or memorandum opinion . . . [where t]he issues presented have been previously decided . . . [or t]he presence or absence of substantial evidence disposes of the issue . . . [or t]he asserted error is not prejudicial to the complaining party . . . [or t]he issues presented are manifestly without merit.").

**I.     BACKGROUND**

{3}     Defendant was indicted and tried in this case for a number of crimes related to the murder of Michael Garris, including felony murder, bribery or intimidation of a

2

witness, and tampering with evidence. The charges arose out of incidents that occurred on February 24 and 25, 2013, at the home shared by Garris and his girlfriend Glennda Trujillo in Albuquerque, New Mexico.

{4} Trujillo testified that Defendant came to their house on February 24. He entered the house through the back door while she was in the restroom. Defendant arrived with a woman that Trujillo did not recognize. Trujillo did not expect Defendant to arrive at the house and had not invited him to the house. Defendant, who had a gun in his pants, began looking through the kitchen cabinets.

{5} Garris was not at the house because he had gone to pick up Trujillo's niece from the bus stop. Defendant told Trujillo to telephone Garris. She tried to call Garris "at least . . . ten times," but he never answered the phone. After an hour to an hour and a half, Defendant and the woman accompanying him left the house.

{6} At approximately 9:15 p.m. on February 25, Trujillo walked out the back door of the house to go to a nearby store while Garris stayed at home. As she entered her car she saw Defendant park a black Chevrolet Trailblazer behind the house. Trujillo had seen Defendant drive the same Trailblazer before and believed it belonged to Defendant's mother. She saw Defendant get out of the car and enter the house through the back door. Trujillo stayed in her car and did not start the engine to avoid being detected. While she waited in her car, she heard Garris scream, "No, Chuey," and then

heard a gunshot from the area of the bedroom. Trujillo testified that she then became frightened, started her car, and began to drive away. She circled the block around her house and returned to the house, where she saw Garris walking behind the house. As she helped Garris into the back seat of her car, Trujillo saw Defendant trying to back his Trailblazer away from the house. Before Defendant left, he instructed Trujillo to clean up the blood and not to call the police or she would be "next."

{7}     Trujillo drove toward the house of a friend who lived down the street. When she saw Defendant had gone to the same house, she made a U-turn and drove down the street while Garris dialed 911 using their cell phone. As Trujillo was driving, she saw paramedics and a fire truck passing her vehicle. Trujillo signaled them to stop and pulled up next to them to tell them that Garris, in the back seat of her car, had been shot. The paramedics placed Garris on a stretcher and transported him to the University of New Mexico hospital where he was declared dead on arrival.

{8}     When police arrived at the scene where Trujillo had flagged down the paramedics, they placed Trujillo into a police car and began their investigation. Trujillo initially told the police that her name was Denise Trujillo, her sister's name, because Trujillo had a warrant for her arrest and wanted to avoid going to jail, but police investigators quickly determined her true identity.

{9}     On the night Garris was shot, Trujillo told the police that the person who shot

4

Garris had covered his face with a bandanna and had driven a white SUV. After she later learned that Garris had died, however, she informed the police that Defendant was the shooter. She also informed them that Defendant drove a black Chevrolet Trailblazer that night. She positively identified Defendant from a photographic array.

{10} The police recovered a bullet and a casing in Garris and Trujillo's house. Detectives testified at trial that the bullet and casing were consistent with having been fired from a .45 caliber firearm.

{11} Police testimony established that when police apprehended Defendant on March 1, 2013, in the front yard of the house where he had lived, they found a black Chevrolet Trailblazer parked in the front driveway of the house and a .45 caliber pistol lying in the front yard. A forensic firearm examiner testified that the casing and bullet recovered in Garris and Trujillo's house were fired from that pistol.

{12} Forensic pathologist Dr. Sam Andrews testified that Garris had an entrance gunshot wound on his lower right back and an exit wound in his lower right abdomen. Dr. Andrews concluded that the gunshot wound was the cause of Garris's death.

{13} Based on jury verdicts finding Defendant guilty, the district court imposed consecutive sentences of life imprisonment for felony murder, three years for intimidation of a witness, eighteen months for tampering with evidence, and two years of habitual offender enhancement for a total penitentiary sentence of life plus six and

a half years.

**{14}** Defendant appeals his convictions directly to this Court. *See* N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."); *State v. Smallwood*, 2007-NMSC-005, ¶ 6, 141 N.M. 178, 152 P.3d 821.

## II. DISCUSSION

**{15}** Defendant makes three arguments for reversal on appeal, none of which were made in the district court or otherwise preserved as potential appellate issues as required by our Rules of Appellate Procedure. *See* Rule 12-321(A) NMRA.

### A. The Admission of Statements Defendant Volunteered After He Invoked His Right to Counsel Did Not Violate Defendant's Miranda Rights

### 1. Standard of Review

**{16}** Defendant asserts for the first time on appeal that the admission of the statements he made after he invoked his right to counsel violated his right to be free from self-incrimination under the Fifth Amendment to the United States Constitution and Article II, Section 15 of the New Mexico Constitution. Defense counsel did not raise this ground of inadmissibility in the district court. Instead, defense counsel argued at trial only that Defendant's statements to police were "cumulative" and "not probative of anything beyond the fact that he's been charged with this crime." In fact,

counsel stated that "the case law is clear that once someone invokes their right and the police stop questioning him, if he reinitiates contact with the police, then it's admissible."

{17} As a result, Defendant did not fairly invoke a district court ruling on the admissibility of the statements under the Fifth Amendment or Article II, Section 15 and did not preserve the issue for appellate review. *See* Rule 12-321(A) ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked."); *Mitchell v. Allison*, 1949-NMSC-070, ¶ 14, 54 N.M. 56, 213 P.2d 231 ("Unless the trial court's attention is called in some manner to the fact that it is committing error, and given an opportunity to correct it, cases will not be reversed because of errors which could and would have been corrected in the trial court, if they had been called to its attention."). We therefore review the admission of the statements only for fundamental error. *See* Rule 12-321(B)(2)(c); *State v. DeGraff*, 2006-NMSC-011, ¶ 21, 139 N.M. 211, 131 P.3d 61.

{18} Under fundamental error review, "we first determine if error occurred; if so, we next determine whether that error was fundamental." *Campos v. Bravo*, 2007-NMSC-021, ¶ 8, 141 N.M. 801, 161 P.3d 846. An error is fundamental when "a defendant's conviction shock[s] the conscience because either (1) the defendant is indisputably innocent, or (2) a mistake in the process makes a conviction fundamentally unfair

notwithstanding the apparent guilt of the accused." *State v. Astorga*, 2015-NMSC-007, ¶ 14, 343 P.3d 1245 (alteration in original) (internal quotation marks and citation omitted).

**{19}** For the reasons that follow, we conclude that the district court did not commit error in admitting Defendant's postinvocation statements. Accordingly, we need not consider whether any error would have shocked our judicial consciences.

**2.    Defendant's Volunteered Statements Are Not Constitutionally Protected from Evidentiary Use**

**{20}** The Fifth Amendment guarantees that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, Article II, Section 15 provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding." N.M. Const. art. II, § 15. In *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), the Supreme Court of the United States interpreted the Fifth Amendment to require the police to advise a person of his or her rights before subjecting the person to a custodial interrogation. Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* This Court has recognized the controlling authority of *Miranda* in our own case law. *See, e.g.*, *State*

8

*v. Baroz*, 2017-NMSC-030, ¶¶ 32-33, 49, 404 P.3d 769 (recognizing and applying *Miranda*).

{21}   A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In the present case, after the police took Defendant into custody on March 1, they transported him to the main police station to interview him. Accordingly, Defendant was subjected to custodial interrogation, and the police were required to advise him of his rights under *Miranda*.

{22}   The detective conducting the interview after Defendant's arrest properly advised Defendant of his *Miranda* rights. In the unedited version of the interview, which was not admitted before the jury, the detective informed Defendant, "[B]ecause you are under arrest and you are at this police facility and I want to conduct an interview with you, I'm going to have to advise you of your rights, okay?" Defendant nodded his head. The detective repeated himself, "So what I'll do is go on record here and advise you of your rights, and you tell me if you understand. Cool? Fair enough?" Defendant responded, "Yes sir." The detective turned on an audio recorder and recited to Defendant his *Miranda* rights in full. Defendant does not challenge admission of this portion of the interview.

{23}   After giving Defendant the *Miranda* warnings, the detective asked Defendant,

"Did you understand the rights that I told you?" Defendant responded, "Yeah; I mean I heard about it. I been to jail before." The detective then asked, "So, basically, the big question is do you want to answer my questions now without consulting with a lawyer?" Defendant responded, "Well I would like to have a lawyer present."

{24} When a person invokes his or her right to an attorney during a custodial interrogation, "the investigation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. A person requesting counsel "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also State v. Madonda*, 2016 NMSC-022, ¶¶ 17-26, 375 P.3d 424 (applying *Miranda* and *Edwards*).

{25} But even after a defendant's invocation of his right to silence, a defendant's voluntary initiation of further communications with the police does not violate his protections against compelled custodial interrogation. *See State v. Fekete*, 1995-NMSC-049, ¶ 43, 120 N.M. 290, 901 P.2d 708 ("However, even when an accused is in custody, *Miranda* protections do not apply in those situations where he or she volunteers statements." (citing *State v. Greene*, 1977-NMSC-111, ¶ 28, 91 N.M. 207, 572 P.2d 935)). "Volunteered statements come within one of two categories: statements which the police did not attempt to elicit, and statements made during

10

custodial interrogation that may be in response to police questioning but are unresponsive to the question asked." *Fekete*, 1995-NMSC-049, ¶ 44.

{26} In this case, after Defendant invoked his right to have counsel present during the interrogation and the interrogation ceased, he continued to voluntarily communicate with the detective. Defendant began by volunteering why he was invoking his right to counsel: "They tried to convict me of something that I didn't do." When the detective responded by asking whether Defendant was saying he was "afraid that that might happen again," Defendant volunteered, "Well I don't even know who the guy is, first of all." Defendant also requested a photo of the victim. Defendant asked the detective other questions and reacted to the answers the detective gave him. When the detective mentioned Garris by name in asking whether Defendant knew that "Michael Garris . . . also goes by Misdemeanor Mike," Defendant asked, "Michael Garris, the one who lives in Westgate?" When the detective stated that he was investigating Garris's homicide, Defendant asked, "He died? Are you serious?" When the detective informed Defendant that Garris was "shot in the back in his house," Defendant exclaimed, "Wow!" When the detective advised the Defendant, "I have an arrest warrant for you for that homicide," Defendant asked, "Why for me?" The detective answered, "Well, because his girlfriend was there when you did it." Defendant replied, "No. That's bullshit." When the detective responded, "I'm just

11

telling you what my investigation is," Defendant volunteered, "My god. He's my friend. That's why I'm like whoa. Oh my god." When the detective advised Defendant, "So you will be going to jail tonight," Defendant volunteered, "But you know what, sir? Goddamn it really. I was there too."

{27} Defendant's postinvocation statements are volunteered communications under *Edwards*. Defendant initiated a conversation with the detective by explaining why he was requesting counsel, and furthered that conversation by asking whether Garris was the person who lived in Westgate and why the detective had a warrant for Defendant's arrest. Additionally, Defendant's statements are volunteered statements under *Fekete*. When the detective asked if Defendant knew that Garris was known as "Misdemeanor Mike," Defendant's answer with a question of his own was not responsive to the detective's question. Defendant's statements, "He's my friend" and "I was there too," were also statements that the detective did not intend to elicit. Accordingly, the statements are not protected under *Miranda*.

{28} We conclude that the district court did not commit any error in admitting Defendant's volunteered statements.

**B.      The District Court Correctly Instructed the Jury on Aggravated Assault**

{29} The predicate felony for the charge of felony murder was aggravated burglary which, as the district court instructed the jury, required proof of the following

12

elements:

    1.      The defendant entered a dwelling without authorization;
    2.      The defendant entered the dwelling with the intent to commit aggravated assault with a deadly weapon once inside;
    3.      The defendant was armed with a firearm.

The court immediately followed this instruction by instructing the jury that the elements of the crime of aggravated assault with a deadly weapon are as follows:

    1.      The defendant surprised Michael Garris by arriving at Michael Garris's dwelling unexpectedly while defendant was armed with a firearm;
    2.      The defendant's conduct caused Michael Garris to believe the defendant was about to intrude on Michael Garris's bodily integrity or personal safety by touching or applying force to Michael Garris in a rude, insolent, or angry manner;
    3.      A reasonable person in the same circumstances as Michael Garris would have had the same belief.

{30}    Although Defendant made no objection to any of these instructions at trial, he argues on appeal that the district court committed fundamental error in the jury instruction for aggravated assault with a deadly weapon. First, Defendant argues that element 1 of the aggravated assault instruction did not properly identify acts that constituted an assault, on the theory that arriving at a person's house unexpectedly does not allege an assault. Second, he contends that an instruction should have been given that would have required the jury to determine that the aggravated assault was "an unlawful act."

## 1.      Standard of Review

{31}     The standard of review applied to jury instructions will depend on whether the issue has been preserved. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. If the error or issue has been preserved, then the instruction is reviewed for reversible error. *State v. Ramos*, 2013-NMSC-031, ¶ 32, 305 P.3d 921 ("Because Defendant objected to the jury instruction tendered at trial, we review his conviction for reversible error."). In this case, Defendant did not object to the instruction given nor did the defense provide an alternative instruction. However, despite Defendant's failure to preserve an objection to the instruction, we will still review to determine whether fundamental error occurred. *See State v. Cunningham*, 2000-NMSC-009, ¶ 10, 128 N.M. 711, 998 P.2d 176.

{32}     Under the standard for either reversible error or fundamental error, the Court examines "'whether a reasonable juror would have been confused or misdirected by the jury instruction.'" *Benally*, 2001-NMSC-033, ¶ 12 (quoting *Cunningham*, 2000-NMSC-009, ¶ 14). Juror confusion or misdirection may occur "not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *Id.* But under fundamental error review, reversal of the jury verdict will not occur unless there would be a "miscarriage of justice." *State v.*

*Montoya*, 2013-NMSC-020, ¶ 14, 306 P.3d 426 (internal quotation marks and citation omitted).

{33} Instructions must ensure the jury understands that it is the state's burden to prove the essential elements of the charged offenses. *Benally*, 2001-NMSC-033, ¶ 17. We reverse for a deficient jury instruction "when the misinstruction leaves us with 'no way of knowing whether the conviction was or was not based on the lack of the essential element.'" *Montoya*, 2013-NMSC-020, ¶ 14 (quoting *State v. Swick*, 2012-NMSC-018, ¶¶ 46, 58, 279 P.3d 747). Even when language in a jury instruction taken in isolation may appear defective, when it is considered in the context of the other instructions given to the jury it may "fairly and accurately state the applicable law." *State v. Hamilton*, 1976-NMSC-082, ¶ 23, 89 N.M. 746, 557 P.2d 1095.

**2.      The Aggravated Assault Elements Instruction**

{34} For the State to prove the aggravated burglary predicate for felony murder, it had to prove that Defendant entered Garris's dwelling without permission in order to commit an aggravated assault with a deadly weapon. Viewing the language of the instructions as a whole, we are satisfied that the jury was sufficiently instructed on those elements.

{35} The language Defendant objects to in element 1 of the aggravated assault instruction, telling the jury it had to find as one element that the defendant "surprised

15

Michael Garris by arriving at Michael Garris's dwelling unexpectedly while defendant was armed with a firearm," cannot be read in isolation from the very next sentence telling the jury it must also find that the conduct "caused Michael Garris to believe the defendant was about to intrude on Michael Garris's bodily integrity or personal safety by touching or applying force to Michael Garris in a rude, insolent, or angry manner." Although the instruction arguably could have been more artfully drafted, it quite sufficiently conveyed to the jury that it had to find that Defendant intruded into Garris's home with the intent to assault Garris with a firearm. Defendant has failed to establish that the wording of the elements instruction constituted fundamental error. There was no doubt in this case that the person who entered Garris's home uninvited, who promptly shot Garris in the back with the loaded pistol he brought with him after Garris cried out for him not to shoot, entered the dwelling with the intent to commit an assault with a deadly weapon. *See Cunningham*, 2000-NMSC-009, ¶ 23 (stating that even a trial court's failure "to instruct on an essential element of a crime for which defendant has been convicted, where there can be no dispute that the element was established, . . . does not require reversal of the conviction"). The issue in this case was not whether the man who intruded into Michael Garris's home and shot him to death committed any of the charged crimes; and Defendant does not challenge the sufficiency of the evidence to establish that he was that intruder.

### 3. A Separate Lawfulness Instruction Was Not Required

**{36}** We also reject Defendant's argument that the trial court committed fundamental error by failing to sua sponte instruct the jury that in addition to the other elements of aggravated assault, the jury had to determine that the perpetrator's conduct was unlawful.

**{37}** The law in New Mexico is clear that an instruction defining the meaning of *unlawful* is not required to supplement an elements instruction in every case, whether or not a criminal statute uses that term in defining a crime. For example, UJI 14-132 NMRA addresses situations where it is necessary to distinguish between lawful and unlawful intrusions on bodily integrity by instructing in appropriate cases that in addition to the other elements of a crime the state must prove that a defendant's act was without consent and was committed with the intent to arouse or gratify sexual desire or intrude upon the bodily integrity or personal safety of a victim and was not done for purposes of reasonable medical treatment, custodial care, lawful arrest, search or confinement, or some other lawful purpose.

**{38}** The first sentence of the UJI 14-132 Use Note provides, "This instruction is intended to aid the court and the parties in preparing an instruction when the statutory definition of the offense includes the term 'unlawful' *and an issue is raised as to the lawfulness of the defendant's act*." (Emphasis added.)

17

**{39}** The Use Note is consistent with our case law. *See, e.g.*, *State v. Johnson*, 1996-NMSC-075, ¶ 19, 122 N.M. 696, 930 P.2d 1148 (holding that "once a defendant introduces some evidence of lawfulness, the court is under a duty to instruct on the state's burden to prove unlawfulness beyond a reasonable doubt" in addition to providing the standard elements instructions).

**{40}** But in this case, the issue of the lawfulness of the fatal intrusion into Garris's home and upon Garris's bodily integrity or personal safety was never raised by Defendant, either in testimony or in any argument in the record. Indeed, it is hard to imagine any reasoned argument that the person who barged into Garris's home, threatened him with a pistol, and shot him in the back did so for any conceivable lawful purpose.

**{41}** We therefore conclude that there was neither fundamental error nor error of any kind as a result of the lack of a separate unlawfulness instruction to supplement the essential elements uniform jury instructions.

**C.    Defendant Has Not Established a Prima Facie Case of Ineffective Assistance of Counsel as a Result of Counsel's Not Attempting to Join Defendant's Two Separate Murder Prosecutions for a Joint Trial**

**{42}** Defendant argues that his counsel was ineffective for not joining this case with a separate case in which Defendant was also charged with first-degree murder. In that case, Defendant was alleged to have committed an armed home invasion and murder

18

of Robert Kinter in the very early hours of the same day on which he was alleged in this case to have committed a nighttime armed home invasion and murder of Michael Garris. We have explained the factual background of Kinter's murder and the procedural background and discussion of the corresponding legal issues in a separate decision filed on this date. *See State v. Suarez*, S-1-SC-36061. Defendant also claims on appeal that he directed his trial counsel to join the cases, but nothing in the record supports those claims.

{43} In *State v. Arredondo*, 2012-NMSC-013, ¶ 38, 278 P.3d 517, we summarized New Mexico requirements for assessment of ineffective assistance of counsel claims on direct appeal.

> For a successful ineffective assistance of counsel claim, a defendant must first demonstrate error on the part of counsel, and then show that the error resulted in prejudice. The record is frequently insufficient to establish whether an action taken by defense counsel was reasonable or if it caused prejudice. Thus, instead of remanding the matter to the trial court, this Court prefers that these claims be brought under habeas corpus proceedings so that the defendant may actually develop the record with respect to defense counsel's actions. For this Court to remand to the trial court on this issue, the defendant must present a prima facie case of ineffective assistance of counsel. Without such prima facie evidence, the Court presumes that defense counsel's performance fell within the range of reasonable representation.

(internal quotation marks and citations omitted). With those principles in mind, we consider Defendant's claims of ineffective assistance of counsel to determine whether

19

a prima facie case has been presented.

{44} Defendant contends that the two murder cases should have been joined to allow him the opportunity to present a theme common to the two cases that he was framed by a gang for both murders. Defendant asserts both murder cases are tied together by his kidnapping and the theft of his cell phone two weeks before the murders occurred. He also asserts in support of his arguments that both cases arose under a single scheme of homicides "involving home invasions that seemed destined to end in the shooting of a male victim in the home he shared with his girlfriend." But Defendant failed to raise any such issues at trial and never created a record from which we could determine either that Defendant's trial counsel performed deficiently or that any such deficiency prejudiced him.

{45} "'A prima facie case for ineffective assistance of counsel is not made if there is a plausible, rational strategy or tactic to explain the counsel's conduct.'" *State v. Ortega*, 2014-NMSC-017, ¶ 55, 327 P.3d 1076 (quoting *Lytle v. Jordan*, 2001-NMSC-016, ¶ 26, 130 N.M. 198, 22 P.3d 666). The record in this case is undeveloped with respect to the reasons why Defendant's counsel did not try to join the two murder cases for trial. During a pretrial hearing in this murder case, Defendant's counsel stated, "There's no link . . . between the two cases."

{46} The record is similarly undeveloped regarding whether the decisions by counsel

20

prejudiced Defendant. To establish prejudice,

> a defendant must demonstrate that counsel's errors were so serious, such a failure of the adversarial process, that such errors undermine [] judicial confidence in the accuracy and reliability of the outcome. A defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289 (alteration in original) (internal quotation marks and citations omitted).

{47}     Defendant relies on *State v. Gallegos*, 2007-NMSC-007, ¶ 15, 141 N.M. 185, 152 P.3d 828, to argue that joinder of offenses "of the same or similar character" is required under Rule 5-203 NMRA. He asserts that he was prejudiced by being "unable to introduce evidence from the other trial that would have demonstrated a pattern of events that would explain the evidence against [him]." He maintains that the jury's inability to hear the testimony of both Peri Schindler, who implicated Defendant in the Kinter murder, and Trujillo in a single trial prevented Defendant from showing the jury the unreliability of their testimony. He argues that the jury in the prosecution of the Kinter murder was unable to hear that Trujillo, in implicating Defendant in the Garris murder, "did not immediately identify [Defendant] until she received a three-way phone call instructing her to do so." Defendant maintains that the jury in the Kinter murder was also deprived of hearing "the lies Ms. Trujillo told regarding her identity and her knowledge of the Garris murder." He similarly argues that the jury

21

in the prosecution of the Garris murder did not hear Schindler's testimony regarding the cell phone that Defendant now maintains on appeal was placed "as a prop" in Kinter's house. However, Defendant made no record in the district court that he attempted to introduce any arguably relevant evidence from the other murder case that might have helped establish such a defense theory in either case.

{48}     Not only is the record before us insufficient to show that Defendant was prejudiced by the separate trials, there is a strong argument that he would have been prejudiced by a joint trial of the two murder prosecutions. *Gallegos* held that a district court abuses its discretion in failing to sever offenses when the evidence pertaining to each charge would not have been cross-admissible. *See* 2007-NMSC-007, ¶ 20. In *State v. Lovett*, 2012-NMSC-036, 286 P.3d 265, this Court analyzed the cross-admissibility of evidence, presented in two separate murder cases joined in a single trial, for its prejudicial impact on the defendant. *Id.* ¶ 1. In *Lovett*, the defendant was charged with two counts of first-degree murder for killing victims Garcia and Simon on separate occasions. *Id.* ¶¶ 2-3, 7. We determined that photographs of Garcia's body presented as evidence at his joint trial were admissible "to illustrate, clarify, and corroborate the testimony of witnesses concerning the scene of the [Garcia] crime, wounds of the victim and identity of the deceased." *Id.* ¶ 34 (internal quotation marks and citation omitted). But that evidence would not have been admissible in a separate

trial for Simon's murder. *Id.* Similarly, we determined that photographs of Simon's body, properly admissible in the trial for her murder, would not have been admissible in a separate trial for Garcia's murder. *Id.* Accordingly, we concluded that "[t]hose photographs d[id] not tend to show motive, opportunity, or any other relevant fact in relation to the *other* murder, other than, perhaps, a propensity for violence, which is an impermissible purpose under our rules" of evidence. *Id.* Viewing the evidence in its totality, we held that the joint trial prejudiced the defendant because "any reasonable person would conclude, as a reasonable probability, that trying the two murders together made the Garcia case stronger and Defendant's conviction more likely" than it would have been in a separate trial. *Id.* ¶ 84.

{49}     In this case, there would have been the same potential for prejudice from a joint trial. The State presented photographs of the bodies of Kinter and Garris in each respective murder trial. Photographs of Kinter's body were admissible in Defendant's trial for Kinter's murder to corroborate witness testimony, the scene at his house, his wounds, and his identity. But those photographs would not have been admissible in a separate trial for Garris's murder. Similarly, the photographs of Garris's body would not have been admissible in a separate trial for Kinter's murder. The potential for a jury to consider photographs from another murder as evidence of Defendant's propensity for violence in each case would have prejudiced him.

23

{50} It is difficult to imagine a competent attorney making a deliberate choice to put the evidence of these two separate homicide prosecutions before the same jury, particularly in light of Defendant's central defense theory in both cases, not that the home invasions and murders did not occur but that he was not properly identified as the perpetrator. In this case, the testifying eyewitness Trujillo knew Defendant and his vehicle and had ample opportunity to observe him when he came to the house on two successive nights, so Defendant's challenge to her identification of him as the shooter was a challenge to her credibility and not to her opportunity to observe. In the Kinter homicide case, Defendant's challenge to the testifying eyewitness's identification of him as the shooter was in large part a challenge to her opportunity to observe, as explored in the separate decision filed on this date in *Suarez*, S-1-SC-36061. Permitting a jury to hear both independent eyewitnesses describe Defendant as the person they saw commit the two separate murders just hours apart, buttressed by the ballistics testimony that the pistol found on the ground near where Defendant was arrested was the same weapon used in both murders, would have strengthened, not weakened, the challenged identifications of Defendant as the shooter in both cases.

{51} Whether there is any case that can ever be made for the proposition that failure to attempt to join Defendant's two murder prosecutions for a joint trial constituted ineffective assistance of counsel, the record before us certainly does not establish a

prima facie case required for a reversal on direct appeal.

**III.	CONCLUSION**

{52}	For the foregoing reasons, we affirm Defendant's convictions in this case.

{53}	**IT IS SO ORDERED.**


_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**


_____
**JUDITH K. NAKAMURA, Chief Justice**

_____
**PETRA JIMENEZ MAES, Justice**


_____
**BARBARA J. VIGIL, Justice**


_____
**GARY L. CLINGMAN, Justice**